Okay, our next appeal is docket number 23-1071, Charles Hagg v. Federal Bureau of Prisons. Okay, our next appeal is docket number 23-1071,    Charles Hagg v. Federal Bureau of Prisons. Mr. Bishop, whenever you're ready. Your Honor, may I please report? My name is John Ed Bishop here on behalf of the appellate Charles Hagg in this case. What you're going to find here is that the issues in this case, they stem from failures by the deciding official, specifically the warden. Those failures then became adopted or in actually some cases completely reworded and changed by the arbitrator when he issued his decision. As you can see, we've raised five issues for this before the Court. Lack of reasonable suspicion for the error analysis performed on Mr. Hagg, admission and acceptance of Agency Exhibit 16, which was the litigation packet, based basically on the failure to produce a doctor. Outside research by the arbitrator. A failure to properly analyze the Douglas factors by the warden and then the arbitrator. And then consideration of factors outside the proposal letter. The main issue or the first issue that actually needs to be addressed is the proposal letter in this case, contained in Appendix 91 through 94. It has two charges. Is that the fifth of the issues that you just listed? Yes, sir. Okay. And actually, because so many of these issues kind of correspond with one another and they interchange, it's the best one to start with. And the reason is this. Charge one is off-duty misconduct. Now, specifically that off-duty misconduct only deals with the June 3 guilty plea for driving under an influence. This is only under the influence of alcohol. If you look and address a record, there is no issue whatsoever to a controlled substance or drug. Reviewing the record indicates that the testimony states that bargaining unit employees typically would get a one-day suspension for a first offense DUI off-duty misconduct. Isn't there sufficient circumstantial evidence here to support a finding that your client did also use marijuana? There's the apparent police test in February, the reasonable suspicion test in March. Right. There's your client's statement about smoking out the vape. There's a statement I think he gave, and he has some experience apparently, that the hangover the next day didn't feel just like an alcohol hangover. Correct. And he himself said the tests he took at home were consistently testing positive, I think, for THC. So wouldn't that all be enough to support a finding that he did use marijuana? Well, and here's the point, Your Honor, and this is why I suggested we start with the proposal letter. This isn't a hearing where anything can come in and anything can be considered. It's very restricted to what was placed in the proposal letter in front of him. And in this case, charge one, where we started here now, with the question dealt only with the alcohol. And if you read the guilty plea that was entered by my client, you will see that there was not a single controlled substance charge that was contained within that plea. They were all dropped. Why were they dropped by the police? No one knows. Was it a faulty test? How about charge two? So charge two is where I was going to go next, Your Honor. So under charge two, your issue is, of course, providing a urine sample that tested positive for marijuana. Now, the agency has no requirement to place a title on a charge. But when they do, that's the charge that's in front of you. And so in this case, he only provided one urine sample, and that was the urine sample provided under the reasonable suspicion test on March 3rd. And as we'll address it. That came back positive. That did come back positive, allegedly. I mean, so he was told it came back positive. We have. Well, not allegedly. It came back positive. Well, yes, Your Honor. I guess it did. I guess my issue with allegedly is without a doctor's testimony, without any supporting of the litigation packet that showed it, BOP policy requires a doctor certify a positive urinalysis test. I have a signature on a piece of paper that was entered into an arbitration, but beyond that, I have nothing else. I guess in the context of Charge 2, the proposal letter also recounts the police blood test, which yielded positive for marijuana, and then also your client's affidavit statement that he had been taking multiple home drug test kits all weekend, and they all came back positive. You're right, Your Honor. But, again, neither of those fall within the charge. Again, there is no requirement for them to put that title, but when they do, that's where we're at. They could have said uses of marijuana or illegal use, off-duty use. They could have actually added a Charge 3 and said providing the police a blood test that tested positive for THC, then they would have had that burden of proof. But nothing was established, especially to prove that blood test, beyond just a simple statement by an officer in an affidavit. No one can sit here and tell me what was the level of that blood test, what was the cutoff they were testing for, when was that machine calibrated. Nothing came into evidence to indicate that. The only thing that should have been at issue at the arbitration was the March 3rd year analysis. That was the only thing in the proposal letter, and therefore the only thing that should be a factor in this case. And you didn't even have the March 3rd documents, correct? Correct. And that was one of the other issues. Despite repeated requests, we never received the March 3rd, what they call a litigation packet. And I do need to correct one issue, Your Honor. And so that litigation packet is actually identified on Appendix 23, the certified list. The parties put it 16 pages. You can look at the record between Appendix 549 and 556. That document is actually 116 pages. The document isn't in front of you, neither party put the litigation packet in the appendix, but the certified list indicates that that's the document that we're discussing. But you did not have it at the time? I never received that 116-page document until the morning of the arbitration. When the government initially responded to the request for the litigation packet, it basically said, well, we don't know what you're talking about. Correct. But you've got to be a little more specific and invited, you know, a further inquiry. Did Mr. Haig subsequently make a more specific inquiry? So there were multiple inquiries that were made, Your Honor. If you look at the request itself, and I'll try to give you the right appendix page, the original, even the issue within your document indicates that this was a second attempt. The attorney had already reached out to get the document. He was denied it as a non-BOP employee. That's when the union then reached out to get it. But I'm interested in what action was taken after the government's response that basically said, we don't know what you're talking about. Be more specific. Well, after that, and I would point, Your Honor, to the testimony of Kevin Hood. If you notice a request was made to Kevin Hood, he passed it to the human resource manager. During the appendix, page 568 through 569. 568? Yes, sir. In 569. And again, this was during COVID. I believe at times they called him Kyle Wood or even Kevin Wood. The name is Kevin Hood was the witness. Point me to some specific. Yes, sir, I can give you that. So if there, what Kevin Hood testifies there is that he knew. And let me get you the exact line number. I apologize, Your Honor. I don't have that. So first, as to what a litigation packet is, look on page number five, or starting at line five. A litigation packet, that's not a big term, is it? No, I know what's in the litigation packet. It's a term of art, yes. If I told you litigation package, you would know exactly what that is. Correct? Yes. And that's a common course in any type of positive year analysis litigation, correct? Yes. If there's a litigation, we would request it. So how did human resource say, I don't know what a litigation packet is? That's an answer that you could have immediately provided. I could have. She asked, without saying yes, I would have told her what the litigation packet was, and then he goes on to say that the donor had the right to receive it. So the request was made to Kevin Hood. Kevin Hood evidently passed it to the human resource manager, Ms. McDonald, who then denied it based on grounds which Kevin Hood testified, yes, I knew what it was. I knew he had a right to it. I just didn't give it to him. I understand all of that. Then I apologize, Your Honor. My question is, well, what happened next? I mean, nut back and say, well, here's specifically what I'm looking for. No, Your Honor, because it was specified. The litigation, once the litigation was packet, I'm not aware of anything in the record where a subsequent e-mail or any written documentation could show that. Whether or not there was additional verbal communication between the union president and the HRM, I couldn't answer that. I'm not going to testify about it. Did he ever make a specific request? I need to see the doctor's statement. I need to see the technical details. I need to know everything you've got that relates to the urinalysis. I don't think you're going to find any more specific examples than the litigation packet. As testified, it's a term of art. When you say litigation packet and you do urinalysis cases, the title of it is litigation packet. It's the term. What's included in there includes all those things. The complete chain of custody, the doctor's report. Again, as you read the objection that was made to the introduction of it at the hearing, it's because it was dispositive. Without that packet coming in, the agency could not meet their burden of proof. And I say I'm getting near my rebuttal time, but I'll continue. They could not meet their burden of proof of saying I have a positive U.A. because the doctors, they were there. The chain of custody that was completed, that is only in that litigation packet, which is signed off by the MRO, again, who never testified. Did the doctor sign off on the urinalysis? Is there a statement in the record that the doctor signed off that the test was positive? In the statement before you, I believe there is a one MRO sheet at the bottom, but I mean, not to deceive the court, while the litigation packet is not in the appendix, yes, the litigation packet did conclude a statement from the doctor that it was a positive urinalysis. And he had signed off on the chain of custody form. The issue is without being able to subject that doctor to cross-examination of those or without having the documents ahead of time in order to question, that puts a huge disadvantage. The courts looked at this in Ramirez before where it talked about the issue of the psychological reports being placed in front of whether or not. Is there something you can identify now? I mean, it appears that you did have the litigation packet, perhaps very, very tardy, where you can say, look, this is how our case was harmed and injured by receiving the litigation packet at such a late-breaking moment or. . . This is unlike a normal civil case. We don't have depositions and discovery. I don't get to know what the doctor is going to say until I get him on the stand for the first time, which has happened repeatedly. So, no, but being denied that opportunity and being denied to have it ahead of time created the issue. You're already in your rebuttal. Yes, sir. But can you just make a brief statement as to your assessment of the Douglas factors? Yes, sir. So one of the biggest issues with the Douglas factors, and I'll keep it very brief, Your Honor, is two issues actually kind of outside the rest of it. One of those is the entire zero tolerance, whether or not the warden felt he had to terminate. And as MSPB has stated, whenever there's a zero tolerance, termination is automatic. There's a natural assumption the deciding official feels that way. He's not going to apply the Douglas factors. And in this case, you're going to find that the warden did so. It was a fact-finding by the arbitrator. Under Appendix No. 16, the arbitrator says termination is automatic, as suggested by the warden. Again on 17, a careful review of the testimony of the warden could lead one to believe that the use of drugs and alcohol results in an automatic penalty of termination in many cases. The arbitrator gets around this by saying, well, while the warden, the deciding official may have said that, BOP policy doesn't require it. Well, the question for the arbitrator is not is the policy correct. It's did the deciding official follow the policy. And he makes his own fact-finding here that the warden, while he says use the principles of Douglas factors, did not apply the Douglas factors directly. And then he goes on to acknowledge that the warden has stated in this case that he felt termination was automatic. And I am getting into my rebuttal, so I'll cover the rest. Thanks very much. Thank you. Good morning, Your Honors. May it please the Court. Starting with a point that Petitioner's Counsel has raised, I will start with the discussion regarding the litigation packet. As the Court indicated through its questioning of Counsel, Counsel did ultimately receive the litigation packet, even if late. Counsel has failed to identify what, if anything differently, he would have asked the MRO, any other witness, had he had the litigation packet at his disposal or had he reviewed it and then decided to ask questions of witnesses, even if late. There's nothing in the briefs indicating what he would have done differently, any additional arguments that would have been made. Is there any good reason for why he got it only the morning of the hearing? Your Honor, I'm unable to answer that question. There's nothing in the record indicating why the litigation packet may have been passed at the time that it was. Let me ask you another point that's really troubled me. The arbitrator seems to have made a fact-finding that Mr. Haig admitted that he used marijuana. I can't find the record support for that admission. Can you help me with that? So the arbitrator did not state that Mr. Haig admitted that he used marijuana. What the arbitrator found, we can essentially look at two different portions of the record. So do you agree that there is no admission by Mr. Haig that he used marijuana? Mr. Haig admitted to his supervisors that he was arrested for DUI and that the police-issued blood tests indicated that his blood tested positive for marijuana. Mr. Haig notified his supervisors of that. And then Mr. Haig, the day of his March 3rd urinalysis, indicated that he had been taking home tests, that he had been testing positive, indicating that he was aware that he would test positive. So, again, he did not admit that he used marijuana. Is that correct? Mr. Haig admitted that he smoked from a vape pen of a shipper. Right. I think what Judge Stark is trying to figure out is what to do with this statement at A11 by the arbitrator where the arbitrator at the top of A11 says, quote, Mr. Haig admitted to using marijuana on or about that date, E9. And that date is referring to March 3rd, 2021, the date of the urine test. So that statement appears to me to be incorrect. So as we argued in our brief, the more reasonable reading of that is that Mr. Haig notified his supervisors, that being Lieutenant Kraut, on or about March 3rd of the positive test. If your honors recall from taking a look at the transcripts, Lieutenant Kraut testified that he essentially had multiple conversations with Mr. Haig. Within about 24 hours of Mr. Haig's initial arrest, Mr. Haig apparently went to Lieutenant Kraut and informed him of the DUI arrest. Lieutenant Kraut then said to Mr. Haig, okay, I need the police paperwork. So Mr. Haig, there may have been at least maybe one, maybe two instances where he provided paperwork to Lieutenant Kraut. Lieutenant Kraut also testified at the arbitration hearing that he received additional police paperwork directly from the police. So it's clear from the record that Mr. Haig had at least, let's say, two, maybe three conversations with Lieutenant Kraut, the last of which appears to have been on or about March 3rd, which is when Lieutenant Kraut and the warden asked Mr. Haig to submit to the urinalysis. And so the more reasonable reading of that particular portion is that on or about March 3rd, Lieutenant Kraut received paperwork and essentially, I don't want to say an admission, but acknowledgement from Mr. Haig that the police paperwork indicated that he tested positive for THC. But there's a difference between Mr. Haig acknowledging that the test was positive and his admission that he used marijuana. He's contesting that fact. He's contesting any use of marijuana, saying, I have no idea how these tests might have been positive. The only thing I can speculate to is that maybe it came from the fact that I smoked this vape pipe. I don't see anything in, you know, referring to his affidavits on page 878, 79, 83, 84. I don't see anything there where he admitted to using marijuana on March 3rd. If I could, Your Honor, it appears that the arbitrator understood exactly what Mr. Haig was essentially admitting to. So if we look at page 10 of the record, the arbitrator acknowledged this is in the first paragraph. Quote, Mr. Haig admitted he reported this test to the bureau's management. Again, this is referring to the blood test that was administered by the police and that he, quote, asserted he did not use any marijuana. He did admit to having used a vape pen given to him by one of the strippers and hypothesized that this may have been the reason for the positive test. And so I point the Court to that because he's all there. Kennedy. But that's not an admission to using marijuana. If anything, he's disputing that. Right. And what I'm saying, Your Honor, is that the arbitrator is not concluding that Mr. Haig admitted to using marijuana. If we look at what Mr. Haig admitted to on or about March 3rd and place that in the context of what the arbitrator acknowledged that Mr. Haig admitted to, it's not the fact that the arbitrator understood Mr. Haig to be admitting to using marijuana. Now, how do you explain A18 and the conclusion by the arbitrator that Mr. Haig had two incidents of marijuana use within a month, which can only mean on or around the February arrest and on or around the March 3rd test? He doesn't say at A18 Mr. Haig admitted to two marijuana uses within a month, but he makes a factual finding that Mr. Haig used marijuana twice within a month. And I would have thought that he's using as support for that conclusion what he mistakenly characterized as an admission by Mr. Haig that he, in fact, used marijuana. So, again, without further explanation from the arbitrator here, what the reasonable interpretation here is that there essentially are two incidences where Mr. Haig tested positive for marijuana, that being the February 7th DUI accident and again on March 3rd. So it appears that the arbitrator is simply indicating that Mr. Haig tested. There were two separate tests and that for each test, Mr. Haig tested positive. Right. And he did. The arbitrator apparently did some independent research on the Internet, according to footnote one on A10, where he, based on this, you know, partial independent research, he concluded it couldn't be possible that the positive test with the police in February could be the same THC that was in a system in March of that same year because of how long THC lasts in a person's system. Right. So I saw that the arbitrator did include that as a footnote. What is most important to note here is that the arbitrator explained that irrespective of whether or not he believed Mr. Haig's theory as to how he came to test positive for marijuana for both February and March, that what was pretty disturbing with regard to his misconduct was, quote, the significance of the DUI. He referred to that specifically at page 10 of the appendix. What is also important to note here is that with regard to Mr. Haig's removal, it's not the case that Mr. Haig could or should have only been removed in the event that he tested multiple times for marijuana. But what was he, in fact, removed just for the DUI? We can we don't have to get into I don't think how serious the DUI was and whether it could have been removed just for that. He, in fact, was not removed just for the DUI, was he? He was removed also because he tested positive on March 3rd. Right. So can we I don't think that means we can just ignore. Well, the agency could have removed him maybe just for the DUI. Or is that what you would have us do? Just say, well, it could have been done on some other grounds than what it was done on. So don't worry about it. Well, I wouldn't say don't don't worry about it. I would say that. The record indicates or makes clear that. Mr. Haig tested positive on March 3rd for THC. He made statements indicating that he knew that he would test positive and that irrespective of what theory Mr. Haig put forth to explain why he was testing positive. The drug free workplace program statement does not include language saying that there has to be intent behind it. And I wanted to bring that up because it seems if maybe one of the unstated arguments that ran pervasive in petitioners brief is this idea that his consumption was not intentional. But I do think that that raises a point about what may have been quite frank. The willful ignorance of Mr. Haig regarding the events that occurred on February 6th. Mr. Haig did indicate that he smoked out of this vape. And it would appear to be that he is now that he is facing the repercussions, attempting to, for lack of a better word, bury his head in the sand and failing to ask questions in that moment, which may have been difficult because he's intoxicated. But to ask questions that would have led him to know in advance that there was marijuana in there. And so there's nothing in the workplace program that would seem to provide shelter for an employee who fails to ask questions when they are placed in a situation that Mr. Haig was in. And then to then deny knowledge and culpability. The focus of the penalty here, though, is not on that February event. It's really on the March urinalysis test. Is that right? Well, it's a combination of both the DUI accident and the charge. Charge 2 specifically says, you know, positive THC from a urinalysis test. Correct. So that's the basis. That's the thing we have to focus on. Right. And is it OK for the MSPB or an arbitrator to do independent scientific research and then rely on that in the final decision? I would think the answer is no. But if you think the answer is yes, I'd really like to hear it. You know, without warning. Right. No briefing. Yes. I'm doing some freelance independent scientific research on Google dot com. And here's what I found. And here's how I'm going to apply that. Well, I think that's OK. Well, I cannot say that if placed in the same search circumstances, I would have done that. However, my background knowledge is a bit different as a former DUI prosecutor. And so I would not have had to do that. So I'm not sure that I am probably the fair person to ask that question to, because I know. Well, we're just asking maybe maybe what the arbitrator should have said was there's nothing in the record and Hogg hasn't produced any evidence to suggest that smoking a vape pen in February might produce a positive THC test. In March, he could could have said because Mr. Hague failed to produce any evidence to support his defense. Then I find that defense not sustainable. But he didn't say that. That's fair. Your Honor, I will note that the arbitrator did say that it is also not clear. I'm looking at page 10, the first sentence of the third paragraph. It is also not clear whether his assertion regarding the positive results from marijuana on both March 3rd and February 6th. And February 7th was the result of his contact with the strippers vape pen. So there he's indicating there seems to be some ambiguity. So it's not as if he is buying into Mr. Hague's theory of how he came. But then he does, as I pointed out before, conclude at the end on 18 that there were two marijuana uses, which I think means he's making a finding that the February vape pen can account for the March. But put that aside for a second. If we as a panel find that there was something improper about the arbitrator doing this outside research, and if we think that that factored into the decision, doesn't that mean we have to at least vacate and remand this case? Yes, Your Honor. Thank you. Talk a little bit about the Douglas factors, as I'm having trouble with the arbitrator's discussion about the Douglas factors and how to support the conclusion that Mr. Hague should be terminated. I mean, I got the sense from reading the arbitrator's decision that he was putting a lot of weight on the warden's statement that was probably somewhat misplaced, that one use is enough or one DUI is enough. But that's not what the charges were. That's not what the conclusion was. The conclusion was that because of the DUI and not one but two incidents of marijuana, termination is the only appropriate conclusion. And I have problems with both the conclusion with regard to two incidents of marijuana and the fact that this statement comes at the end of a very abbreviated discussion about the Douglas factors, which I came away with the sense that the arbitrator really did not consider the Douglas factors in assessing the penalty. Well, Your Honor, if we look at page 16 of the arbitrator's opinion, the arbitrator notes consistent with the court that it's the petitioner's position that the Douglas factors were not thoroughly considered. And the arbitrator begins his analysis by saying that while not applying the Douglas factors in a direct manner, it's clear that the warden used the principles set forth by Douglas to reach his conclusions. The arbitrator then from page 16 through the end of his opinion does go into detail regarding the Douglas factors. If we look at page 17, the arbitrator does specifically hone in on one of the particularly salient Douglas factors, which is the length of service. And he indicates that it appears that one of the most important criteria is the petitioner's length of service, which at the time of the incident was only about two years. And the arbitrator, looking at the length of service relative to the misconduct alleged in this case, which was the DUI accident and the March 3rd positive test concluded that removal was appropriate, given, again, the totality of the circumstances relative to the short amount of time that the petitioner had been with BOP. The arbitrator also engaged in a pretty thorough analysis when he considered the cases that the petitioner had raised with regard to other employees who had not been removed for somewhat similar instances of misconduct. And the arbitrator did do a thorough analysis, essentially saying that, I understand that these are the cases that have been presented, but in my review of those cases, the employees there were not similarly situated because they had been with their agencies for 20, 30, or whatever particular timeframe it had been, which distinguished it from the case at bar before the arbitrator. And so even if the court views the arbitrator's opinion as somewhat succinct, he did hone in on what some of the key and salient Douglas factors were. Over your time, but I do have one final question, and that is about the other side's argument that the government's failure to bring the doctor in to testify means that there is some failure of proof on the government's part to establish that there was a positive test result in March of 2021. Could you speak to that? So essentially the petitioner is raising an imperfect chain of custody argument and essentially saying that the doctor needs to come in to testify to the positive drug, your analysis results, and to essentially shore... I think there's potentially a few different arguments. One is a chain of custody. I don't think I saw the term chain of custody appear until the great brief. Then there's a second argument, and that could be a proper foundation for the actual one-page test report, and you need the doctor for that. And then maybe there's a third argument, and that third argument would be the doctor needs to come in to assure the arbitrator of the reliability of the test and test results. So putting aside the chain of custody, could you just comment on the other two? So with regard to the doctor's presence, as we did note in our brief, the identity of the doctor was known to the petitioner, and there was nothing to prevent him from calling the doctor in to the extent that he had questions for the doctor. There's nothing in the record indicating that that occurred. Even if the agency or petitioner had called the doctor to testify, there's nothing in the record or even indicated in the petitioner's brief what line of questioning he would have asked the doctor or what the doctor would have said differently. It's undisputed that petitioner did test positive for marijuana when he gave the sample on March 3rd. There's nothing in the record indicating that petitioner, let's say, directly challenged those results. He made statements indicating that he knew he was going to test positive. And so while I don't mean to say, you know, what difference does it make, what is before the court is the fact that the petitioner knew what his results would be. They were indeed that, and there's no evidence in the record that the doctor would or could have potentially testified differently. Particularly if we do look at the MRO review sheet in which the doctor indicated the positive test. He presumably would have testified consistent with that document, and there's nothing in the record, and petitioners made no arguments insinuating otherwise. Thank you. Mr. Bishop, I think you get your full five. Thank you, Your Honor. I'd like to kind of start at the end of it. The issue and the last thing that was addressed, and that's what the doctor would presumably testify in the courts. Again, that's the issue. That's the presumption. The doctor is now not being subjected to cross-examination to be able to be detailed on that report. Did he comply with all the policies? Were there fatal errors that he made within the course of that test? Until he can be questioned, until he can be called to task for those, then to take those findings, even more damaging without the paperwork, but especially without him testifying, there are too many issues, even outside the chain of custody, but the chain of custody is one, is an issue itself, Your Honor. What about the suggestion that you should have called him anyway? I mean, he was on the witness list, Your Honor. He's a contract employee just like Ramirez with the agency. So in that issue, I believe you will also find that. I don't know. What is the answer? You thought he was going to be there? Yes, Your Honor. In every litigation, the doctor had always been called prior. Actually, we got that testimony from Kevin Hood, and I can point that to you in the appendix, that typically the doctor does testify on behalf of the agency. I mean, not in the record, but yes, Your Honor, I was called completely by surprise when the doctor was not there. When you talked about the admission of marijuana, there's some questioning concerning that? Well, they try to say this is a misstatement. The arbitrator doesn't say it just once. He states that Mr. Hagg made the admission twice within it, in very clear language. So not only on page 11, which was noted before, but if you look on page 15, which is before the second paragraph, you're going to see another admission where it says Mr. Hagg admitted to his intoxication and use of marijuana. And by the way, in both places, there's a reference to E9. What is E9, and is that in our appendix? That is, the arbitrator seems to find support for the admission at E9. Let me look at page 23 of the appendix, and it will tell me what E9 is. That would be the Hagg affidavit, which I know are — I don't have the appendix numbers for you, but the affidavits from Mr. Hagg were examined on it. It's a collective — collection of Hagg affidavits. Yes, Your Honor. Okay. Thank you. One issue that wasn't addressed due to timing and I would like to cover just very briefly, and that's the issue of this prior usage. That Mr. Hagg may have used drugs prior to his work with the BOP. There was testimony concerned that the warden, when he was hired, he disclosed there was a prior drug usage. The warden signed a waiver to allow him to come in, which was in the power of the warden. But that's not contained anywhere within the proposal letter. But then it becomes clear during questioning of the warden during the arbitration that this was a factor that he took into account. This now becomes an aggravating factor in violation of ward that he used to determine, I have a history here. And, in fact, the warden used the exact words, what does this mean to you, history of drug use. This is troubling for a few reasons. I mean, one, it wasn't in the proposal letter. Ward was about the agency relying in part on ex parte communications. It was. And here it's more of a fact finder relying on materials that maybe the agency, the deciding official didn't rely on. So is Ward the right? I believe it is. Because this case, the deciding official himself did rely on them, too. You have it first in the warden's testimony that he relied on that history. And, again, he was not a fact finder. He was the deciding official for this case. But the warden cleaned up his testimony, so to speak, right? He tried to. And then he. And so now it's a question of fact, how best to understand what did the warden really mean, what he said, whatever he said. I don't think so. Because, again, and, again, I guess you can try to make that. But at this point, at two different locations, on the appendix 270 to 271, when I hired him, I approved a waiver. Because he was previously charged with the use of illegal drugs. So I gave him an opportunity. His misconduct that occurred was a problem for the agency, for SCI McCain, and the reputation. That was taken into consideration. Due to him continuing to conduct himself, I felt he could not be rehabilitated. That's why I made the decision I made. I think that's pretty crystal. Yes, the warden did attempt to backtrack, but then actually was questioned again. So knowing that, the prior drug use, his prior employment, how did that affect your analysis of the Douglas factors? Warden's answer, history of drug use. So while Ward was the knowledge through ex parte, one of the issues, what the deciding official found in Ward was, hey, I'm relying on this extra information to establish a history. It's the same thing the warden did here when that was not within the proposal. So what about the credibility point? Because the warden does contradict himself elsewhere in his testimony. And isn't it for the arbitrator who saw all of this to decide which portion of the testimony to credit? I believe so. But if you look at the question I just cited, it comes immediately thereafter, the question where he said, well, I relied on what I should have relied on. In fact, he doesn't, and I don't have the exact quote, but the warden doesn't say what he relied on. He goes, no, I relied on what I was supposed to, basically. And then that was the follow-up question. Someone later says, are you saying that was not a factor? And he says it was not a factor. So you misspoke earlier? And he's like, he just says it was contained in the file. So anyway, I mean, the point being, it seems to me his testimony is all over the place. And there it was. Right. But we didn't see it, and the arbitrator did. And the arbitrator credited the portions, credited certain portions and not other portions. Shouldn't we just defer to that? In that, you can attempt to make that deference, but the very fact that it was contained, he did use exact words that it was a factor. I mean, either, again, you have a contradiction in the testimony, or you have consideration of something outside the proposal letter. And I don't think it can be argued that there at least wasn't some consideration of it. Thank you. Okay. Thank you very much, Mr. Bishop. The case is submitted.